## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JUSTIN BLONSTEIN, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | **Civil Action No. _____** |
| vs. | ) ) | |
| GGP, INC., SANDEEP MATHRANI, RICHARD CLARK, MARY LOUI FIALA, J. BRUCE FLATT, JANICE R. FUKAKUSA, JOHN K. HALEY, DANIEL B. HURWITZ, BRIAN W. KINGSTON, CHRISTINA M. LOFGREN, BROOKFIELD PROPERTY L.P. and GOLDFINCH MERGER SUB CORP., | ) ) ) ) ) ) ) ) ) ) ) | **CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> **JURY TRIAL DEMAND** |
| Defendants. | ) | |

Plaintiff Justin Blonstein ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, files this action against the defendants and alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

### SUMMARY OF THE ACTION

1.      Plaintiff brings this stockholder class action on behalf of himself and all other public stockholders of GGP, Inc. ("GGP" or the "Company") against GGP's Board of Directors (the "Board" or the "Individual Defendants"), Brookfield Property Partners, L.P. ("Parent"), and Goldfinch Merger Sub Corp. ("Merger Sub",

collectively with Parent, "Brookfield") (collectively referred to as "Defendants"), for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and for breaches of fiduciary duty and aiding and abetting thereof as a result of the Defendants' efforts to sell the Company to Brookfield as a result of an unfair process for an unfair price.  Plaintiff challenges and seeks to enjoin an upcoming stockholder vote on a proposed stock and cash transaction by which Brookfield will acquire each issued and outstanding share of GGP for an inadequate and insufficient price (the "Proposed Transaction" or "Merger").  Both companies' boards of directors have approved the deal.

2.      Pursuant to the terms of the definitive Agreement and Plan of Merger entered into by and among GGP and Brookfield on March 26, 2018 (the "Merger Agreement"), Brookfield will acquire all of the outstanding shares of GGP common stock, in compensation for which, GGP stockholders will be entitled to elect to receive, either $23.50 in cash or one Brookfield unit or one share of a new Brookfield U.S. REIT security, subject to proration.

3.      Thereafter, on May 2, 2018, Brookfield filed a registration statement on Form S-4/F-4 (the "S-4") with the Securities and Exchange Commission (the "SEC") in support of the Proposed Transaction.  Notably the S-4 is wholly insufficient and provides either materially misleading and or insufficient information for GGP stockholders to properly analyze whether to vote in favor of the Proposed

Transaction, and is therefore a continuation of the Board's breaches of fiduciary duty aided and abetted by Brookfield and the Merger Sub.

4.      The Proposed Transaction is unfair and undervalued for a number of reasons.  Significantly, the S-4 describes an insufficient sales process in which the Board only paid lip service to its fiduciary duties engaging in a month's long transaction in which reaching out to potentially interested third parties was never even a consideration.

5.      More troubling, the S-4 reveals that the only acquirer ever considered was Brookfield, a stockholder that owns approximately 34% of GGP common stock. Due to such holdings, Brookfield has installed several Directors on the GGP Board who are employed and/or affiliated with Brookfield at the highest levels, including GGP's Chairman of the Board.  As such, Brookfield is a controlling stockholder of GGP, thus triggering the "entire fairness" standard's application for any evaluation of the Proposed Transaction.  In addition, Brookfield and Merger Sub aided and abetted the Board's breaches of its fiduciary duties, further evidenced by the information contained in the S-4.

6.      Moreover, while the S-4 indicates that a Special Committee of the Board was created to ostensibly run the process, Director Defendant Janice R. Fukakusa's ("Fukakusa") presence on this Special Committee raises serious concerns regarding the Special Committee's ability to function adequately to meet

3

its, and the overall Board's fiduciary duties. Specifically, Fukakusa has been employed with Royal Bank of Canada ("RBC") since 1985, in several high-level positions. As revealed in the Merger Agreement, RBC is one of several financial entities described as Co-Syndicators backing GGP through a large Credit Agreement originating in 2015. As a term of the Merger Agreement, this Credit Agreement will be paid off in full as a requirement of the Merger Agreement. Therefore, it is in RBC's, and Fukakusa's overriding interest that the Merger Agreement be allowed to reach consummation, no matter the consequence it may have on GGP's common stockholders.

7.     In addition to Brookfield's interest in the Proposed Transaction, the deal may also be tainted by conflicts of interest of the Directors and Company executives. Notably, certain of the Company's Directors and senior executive officers may have been motivated to enter into the Proposed Transaction in order to receive benefits not shared equally with Plaintiff and members of the Class (defined below). Under the terms of the Merger Agreement, all illiquid Company options and other incentive awards will vest no later than seven days before the effective date of the Proposed Transaction. Furthermore, several of the Company insiders, will be the recipients of lucrative "golden parachute" awards.

8.     If the Proposed Transaction is approved, the Individual Defendants will have breached their fiduciary duties of loyalty and due care by, *inter alia*, agreeing

to sell GGP without first taking steps to ensure that Plaintiff and Class members (defined below), who are the minority stockholders of the Company, would obtain adequate and fair consideration under the circumstances.  Moreover, as alleged further herein, Brookfield and Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty.

9.       Finally, in violation of sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and their fiduciary duties, Defendants caused to be filed the materially deficient S-4 on May 2, 2018 with the SEC in an effort to solicit stockholders to vote their GGP shares in favor of the Proposed Transaction.  The S-4 is materially deficient and deprives GGP stockholders of the information they need to make an intelligent, informed and rational decision of whether to vote their shares in favor of the Proposed Transaction.  As detailed below, the S-4 omits and/or misrepresents material information concerning, among other things: (a) the sales process leading up to the Proposed Transaction; (b) the Company's financial projections; (c) Brookfield's financial projections; and (d) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by Financial Advisor to the Board's Special Committee, Goldman Sachs & Co. LLC ("Goldman Sachs").

10.      Absent judicial intervention, the merger will be consummated, resulting in irreparable injury to Plaintiff and the Class.  Accordingly, this action seeks to

enjoin the Proposed Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to GGP's stockholders, and to recover damages resulting from violations of federal securities laws by Defendants.

11.    Plaintiff alleges that he, along with all other public stockholders of GGP common stock, are entitled to enjoin the Proposed Transaction or, alternatively, to recover damages in the event that the Proposed Transaction is consummated.  The consideration offered to GGP stockholders is inadequate.

## THE PARTIES

12.    Plaintiff Justin Blonstein is and has been a stockholder of GGP during all relevant times hereto.

13.    GGP is a Delaware corporation that maintains its principal place of business at 350 N. Orleans St., Suite 300, Chicago, IL 60654.  GGP is an S&P 500 company focused exclusively on owning, managing, leasing and redeveloping high-quality retail properties throughout the United States.  The Company's common stock is traded on the New York Stock Exchange ("NYSE") under the symbol "GGP."

14.    Defendant Sandee Mathrani ("Mathrani") has served as a director of GGP at all relevant times.  In addition, Mathrani currently serves as the Company's Chief Executive Officer ("CEO").

15.     Defendant Richard Clark ("Clark") has served as a director of GGP at all relevant times and is the Chairman of the GGP Board.  In addition, Clark serves as a member on the Board's Nominating and Governance Committee.  Clark is also intricately associated with Brookfield, holding the position of senior managing partner at Brookfield and the Chairman of Brookfield Property Group, the real estate investment arm of Brookfield Asset Management Inc., which owns approximately 70% of the outstanding stock of Brookfield.  Clark has served in his current, or various prior senior roles with Brookfield or its affiliated entities, since at least 1984.  Clark, through his affiliation with Brookfield, and specifically through the Investment Agreement (as defined in the Merger Agreement), is considered a Brookfield Designee, and may be deemed to have control over certain shares and warrants of GGP held by Brookfield related entities.

16.     Defendant Mary Loui Fiala ("Fiala") has served as a director of GGP at all relevant times.

17.     Defendant J. Bruce Flatt ("Flatt") has served as a director of GGP at all relevant times.  In addition, Flatt is affiliated with Brookfield - CEO of Brookfield Asset Management, a director of Brookfield Asset Management and a Chairman of its investment committee.

18.     Defendant Janice R. Fukakusa ("Fukakusa") has served as a director of GGP at all relevant times.  Fukakusa currently holds the positions of Chief

Administrative Officer and Chief Financial Officer of Royal Bank of Canada ("RBC"). RBC is a member of the syndicate of lenders financing the Proposed Transaction according to the March 26, 2018 press release announcing the merger, and is a Co-Syndication Agent according to the Merger Agreement. Fukakusa, and others with relationships with Brookfield, are able to serve as Directors of GGP due to Defendant Clark's influence and presence on the GGP Board's Nominating and Governance Committee. Despite this clear undue influence upon Fukakusa by Brookfield and its affiliates, she was allowed to sit on the Special Committee of so-called "Independent" Board Members, which ran the process. Fukakusa's presence on the Special Committee therefore extended Brookfield's control to the Special Committee and further tainted the sales process.

19.     Defendant John K. Haley ("Haley") has served as a director of GGP at all relevant times.

20.     Defendant Daniel B. Hurwitz ("Hurwitz") has served as a director of GGP at all relevant times.

21.     Defendant Brian W. Kingston ("Kinston") has served as a director of GGP at all relevant times. Kingston is closely affiliated with Brookfield, and currently serves as the CEO of Brookfield Asset Management and Brookfield Property Group and as a Senior Managing Partner of Brookfield Asset Management.

22.     Defendant Christina M. Lofgren ("Lofgren") has served as a director of GGP at all relevant times.

23.     Individual Defendants in paragraphs 14 - 22 are, and at all times relevant hereto have been, directors of GGP.

24.     The Defendants named in paragraphs 14 – 22 are referred to herein as "Individual Defendants" or "Director Defendants."

25.     The Director Defendants owe fiduciary duties including good faith, loyalty, fair dealing, due care and candor to GGP and its stockholders.

26.     The Director Defendants, by reason of their corporate directorships and/or executive positions, are fiduciaries to and for the Company's stockholders, which fiduciary relationship required them to exercise their best judgment, and to act in a prudent manner and in the best interests of the Company's stockholders.

27.     Each Director Defendant herein is sued individually, as a conspirator and aider and abettor, as well as in their capacity as an officer and/or director of the Company, and the liability of each arises from the fact that they have engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

28.     Defendant Brookfield is a Bermuda partnership with its principle place of business located at 73 Front Street, 5th Floor, Hamilton, HM 12 Bermuda. Brookfield is one of the world's largest commercial real estate companies, with approximately $68 billion in total assets.  Brookfield is the flagship listed real estate

company of Brookfield Asset Management, a leading global alternative asset manager with over $265 billion in assets under management.  Brookfield is traded on the NasdaqGS under the ticker symbol "BPY."   Further, Pursuant to an Investment Agreement previously entered into as between GGP and Brookfield, the GGP Board is required to have nine members, three of whom were designated by Brookfield (the "Brookfield Designees").  According to the Investment Agreement, Brookfield's right to designate three directors will continue so long as Brookfield beneficially owns at least 20% of GGP's commons stock on a fully diluted basis, with such right reducing to two directors if Brookfield beneficially owns between 15% and 20% of GGP's common stock on a fully diluted basis and one director if Brookfield Beneficially owns between 10% and 15% of GGP's common stock on a fully diluted basis.  Brookfield will have no right to designate a director if it beneficially owns less than 10% of GGP's common stock on a fully diluted basis.

29.   Brookfield has been closely entwined, and a major stockholder of, GGP for some time.  In fact, GGP's most recent Form 10-K states, in relevant part:

> Brookfield owns, or manages on behalf of third parties, a significant portion of the shares of our common stock. Brookfield has entered into standstill agreements to limit their influence, the concentration of ownership of our outstanding equity held or managed by Brookfield may make some transactions more difficult or impossible without their support, or more likely with their support.  The interests of Brookfield, any other substantial Stockholder or any of their respective affiliates could conflict with or differ from our interests or the interests of the holders of our common stock.  For example, the

concentration of ownership held or managed by Brookfield could delay, defer or prevent a change of control of our company or impede a merger, takeover or other business combination that may otherwise be favorable for us and the other stockholders. Brookfield may also pursue acquisition opportunities that may be complementary to our business, and as a result, those acquisition opportunities may not be available to us. We cannot assure you that the standstill agreements can fully protect against these risks.

30.    Defendant Merger Sub is a wholly owned subsidiary of Brookfield created for the sole purpose of effectuating the Proposed Transaction.

## JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act. This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

32.    Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because GGP is incorporated in this District, and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of GGP common stock who are being and will be harmed by Defendants' actions described herein (the "Class"). The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

35.     This action is properly maintainable as a class action because:

    a. The Class is so numerous that joinder of all members is impracticable. GGP's stock is publicly traded on the NYSE and, as of December 31, 2017, there were 957,017,459 such shares outstanding. The actual number of public stockholders of GGP will be ascertained through discovery;

    b. There are questions of law and fact which are common to the Class, including *inter alia*, the following;

        i.    Whether Defendants have violated the federal securities laws;

      ii.     Whether Defendants made material misrepresentations and/or omitted material facts in the S-4; and

      iii.    Whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Proposed Transaction is consummated;

c.  Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

f.  Plaintiff anticipates that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

g.  Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

36.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with GGP and owe the Company the duties of due care, loyalty, and good faith.

37.     By virtue of their positions as directors and/or officers of GGP, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause GGP to engage in the practices complained of herein.

38.     Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company.  To diligently comply with these duties, directors of a corporation must:

a.  act with the requisite diligence and due care that is reasonable under the circumstances;

14

b. act in the best interest of the company;

c. use reasonable means to obtain material information relating to a given action or decision;

d. refrain from acts involving conflicts of interest between the fulfillment of their roles in the company and the fulfillment of any other roles or their personal affairs;

e. avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

f. disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the company.

39. In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of GGP, are obligated to refrain from:

a. participating in any transaction where the directors' or officers' loyalties are divided;

b. participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public stockholders; and/or

c.  unjustly enriching themselves at the expense or to the detriment of the Company or its stockholders.

40.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to GGP, Plaintiff and the other public stockholders of GGP, including their duties of loyalty, good faith, and due care.

41.     As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their GGP common stock in the Proposed Transaction

## SUBSTANTIVE ALLEGATIONS

### *GGP Background*

42.     GGP is a S&P 500 company focused exclusively on owning, managing, leasing and redeveloping high-quality retail properties throughout the United States.

43.     As recent promising financial performance evidences, GGP is clearly a financially strong company on the rise.

44.     In an October 31, 2017 press release reporting financial results for Q3 2017, GGP noted such financial highlights as an increase in Company Same Store Net Operating income of 2.0% from the previous quarter.

45.     This financial success has been well received by those in the market, which consider GGP to be a "Class A mall real estate investment trust ("REIT")"

because if the high standard of properties it holds, including luxury shopping locations throughout the country with high rates of leased space.

46.     This financial success was touched upon in a May 1, 2017 earnings call, in which Defendant Mathrani stated that he believed "[t]here is wide discount between public and private markets, [with some of the parts] is far greater than [GGP]'s current stock price'" and that the Company is "[r]eviewing all strategic alternative to bridge the gap."

47.     Mathrani continued, in a statement regarding the value of the Company,

**Michael Bilerman**, Citigroup Inc, Research Division - MD and Head of the US Real Estate and Lodging Research

Sandeep, it's Michael again.  To think back to when you joint ventured Ala Moana or Fashion Show, part of that was reducing exposure in certain assets, highlight the value, deleverage. As I think about your high-quality assets and respecting that there's a disconnect between public and private market pricing, part of the hesitation, I think, in the past was giving up the higher-growth level in those assets just to highlight value. And so I understand it from a risk profile, when Ala Moana, in fact, going into our asset in the middle of the ocean trying to reduce some net risk and get value.  But maybe just -- I guess why joint venture assets as one of the options?  Does that solve the problem?

**Sandeep Lakhmi Mathrani**, GGP Inc. - CEO and Director

Michael, I think it's up to us to sort of think a path just for the sake of discussion. If you sold an asset and you dividend out the cash to your investor base and they believe they can invest their money, it's -- all it does is it takes it off the top. If you buy back your stock, it's a whole different animal.

17

> So I could take a very extreme situation and say, let me sell 80 A malls and dividend out $25 in dividends, or some math better than that, and then I have 50 assets producing $0.5 billion of cash flow with a 0 stock price or say a $0.25 stock price.
>
> I don't know the answer.  All I'm trying to demonstrate is that if a market doesn't value the real estate, it's our job to make sure that the investors get their appreciation, either in the form of dividend or some form of demonstration that we are in the real estate business and the real estate needs to be valued appropriately. So I don't really have an answer.  All I do realize is the disconnect has gotten so wide, it is up to us to demonstrate to the market that there's a real estate value at stake here.

48.     Mathrani's statements reflect the understanding that the Company was properly valued in the upper $20s per share range.  Indeed, the financial media also agreed with the GGP CEO, with several articles discussing the Company's worth after the public announcement of an unsolicited bid by Brookfield to acquire GGP for $23.00 per share in November 2017.  For instance, a *Seeking Alpha* article penned by equity value analyst Vince Martin on November 15, 2017 and titled "$23 Isn't Going to Get it Done for GGP", stated the following:

> The argument from GGP, and Macerich, and Simon during the past two years has been that the stock price is *wrong*. Mangement in the Class A space is not, like management at struggling retailers, talking up unspecified "challenges" or promising a turnaround or looking for aggressive cost-cutting. It's not staying essentially, that things will get better or that the situation will change.  Rather, the argument from GGP and its peers is that things are *good*.  The numbers still are holding up.
> --------------------------------------------------------------------------
> I'd argue that the most likely outcome here is a takeout in the high 20s.  GGP is frustrated with its public market performance, Brookfield still gets a deal at $28 (~17x FFO), and the deal is

enough of a premium to satisfy existing shareholders.  For what it's worth, the sell-side agrees: as this site reported on Monday, Boenning & Scattergood predicted $30+ in a takeout, Wells Fargo (NYSE:WFC) $25-$26, and Sandler O'Neill $28+.

-------------------------------------------------------------------------

….The relationship between BPY and GGP makes it tough to walk a deal back at this point.  GGP's own statements make it tough for the company to take $25 or less.  Pretty much everyone here is incentivized to do a deal in the $28-30 range.  And I think it's highly likely that's where the deal will get done.

49.    In addition, Julian Lin penned in a November 27, 2017 *Seeking Alpha* article, noted that GGP's stock price had a highly positive outlook, and that it was at a then-current depressed value due to a perceived slump in the retail industry, rather than in any financial results of the Company itself.  Lin indicated that Class A malls "have already started moving up and I believe the rally is just getting started."   He would further characterize GGP's stock as "trading at opportunistic valuations not seen in years."  Most notable however, was Lin's prediction that a deal for GGP would get done at over $30 per share, due to GGP's high-quality stock at a then cheap price.

50.    Despite this positive and high valuation of many in the financial media, and amongst Company insiders, the Proposed Transaction, and the valuation contained therein do not account for GGP's continuous financial success.   If consummated, the Propose Transaction would deprive Plaintiff and other members of the Class the true value of their investments.

***The Process Leading to the Proposed Transaction***

51.    As detailed in the S-4, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of both Brookfield and the Individual Defendants, and was designed with only one concern in mind – to effectuate a sale of the Company to Brookfield.

52.    On October 6, 2017, certain affiliates of Brookfield exercised all of their respective warrants to acquire additional shares of GGP.  This exercise resulted in Brookfield increasing its aggregate ownership of GGP from approximately 29% to approximately 34%.  Such actions were clearly in anticipation of Brookfield's ultimate goal of entire control of GGP.

53.    Shortly thereafter, on November 10, 2017, Defendant Kingston, informed Defendant Hurwitz that Brookfield planned on delivering a non-binding proposal to acquire GGP in the near term.  Such action was representative of Kingston's conduct throughout the sales process in that he did not allow his position on the Board of GGP to interfere with taking any and all actions at the behest of or to further the interests of Brookfield.

54.    On November 11, 2017, Brookfield submitted a bid to acquire the remaining stock of GGP it did not currently own for approximately $14.8 billion, which would have been paid in a 50/50 cash/stock split, and valued GGP stock at $23.00 per share.  This bid would be made public the following day.

55.    Also on November 11, 2017, the Board created the Special Committee, composed of Defendants Fiala, Fukakusa, Haley, Hurwitz, and Lofgren. Notably, the S-4 does not indicate why Fukakusa was included in the composition of the Special Committee, due to her nature as a long-time, high-level, employee of RBC who has a financial interest in the Proposed Transaction reaching consummation.

56.    Notably, the S-4 reveals that at no point after this bid was submitted, did the Company, Board, or Special Committee created to run the so-called "sales process" ever decide to reach out to any potential third-party whatsoever to gauge interest on the market, or to initiate a potential bidding war with Brookfield that could drive the merger consideration up and benefit GGP stockholders.

57.    In addition, the S-4 also indicates that on November 11, 2017, Citigroup Global Markets Inc. ("Citigroup") was engaged as a financial advisor to GGP to assist with the Proposed Transaction; however, it appears that Citigroup did not issue a fairness opinion to GGP to support the Proposed Transaction. In fact, besides the above information regarding its engagement as a financial advisor to GGP, Citigroup does not appear in a substantive manner at any other point in the S-4, including facts relating to the amount GGP paid to Citigroup for any services.

58.    Moreover, the S-4 is unclear as to the specific nature of the non-disclosure agreement executed between GGP and Brookfield on December 6, 2017, and if the terms of such agreement included a "don't-ask, don't-waive" provision or

standstill provision, and if so, the specific conditions, if any, under which such provisions would fall away or prevent other parties from submitting a bid. This fact is particularly relevant given the consensus amongst those in financial media of the high price target of the Company.

59.    The S-4 also reveals that the Board, including the Special Committee, held their own interests as the utmost importance, discussing the retention of GGP management post-close of any transaction on December 8, 2017, nearly four months before the eventual execution of the Merger Agreement.  Such discussions also resulted in the retention of an "independent compensation consultant" that would discuss "certain considerations relating to management compensation in connection with a potential transaction involving GGP."  Despite such discussions with this compensation consultant occurring on at least one occasion on January 5, 2018, the identity, specific nature of this consultation, or the amount paid by the Company to this consultant, is not divulged by the S-4.  Clearly, while the pecuniary interests of Company insiders warranted attention early on in the process, as well as the attention of a specialized consultant to advise on such matters, the interests of Plaintiff and other public stockholders of GGP were not granted the same consideration.

### The Proposed Transaction

60.    On March 26, 2018, Brookfield and the Special Committee announced the Proposed Transaction.  The press release states in relevant part as follows:

**Brookfield News, March 26, 2018 –** Brookfield Property Partners L.P. ("BPY") (NASDAQ: BPY; TSX: BPY.UN) and the Special Committee of the Board of Directors of GGP Inc. (the "Special Committee") today announced that BPY and GGP Inc. ("GGP") (NYSE: GGP) have entered into a definitive agreement for BPY to acquire all of the outstanding shares of common stock of GGP other than those shares currently held by BPY and its affiliates.

In the transaction, GGP shareholders will be entitled to elect to receive, for each GGP common share, either $23.50 in cash or either one BPY unit or one share of a new BPY U.S. REIT security, subject to proration based on aggregate cash consideration of $9.25 billion.

As compared to the offer to acquire GGP that BPY publicly announced on November 13, 2017, the transaction includes:

i.   An increase in the cash consideration from $23.00 to $23.50 per GGP share;

ii.  A $1.85 billion increase in the aggregate cash consideration, from $7.4 billion to $9.25 billion;

iii. An increase in the exchange ratio from 0.9656 to 1.0000; and

iv.  The creation of a new BPY U.S. REIT ("BPR") that will qualify as a REIT for tax purposes and issue shares in the transaction. Shares in BPR are structured with the intention of providing an economic return equivalent to BPY units, including identical distributions. BPR shareholders will have the right to exchange each BPR share for one BPY unit, or the cash equivalent of one BPY unit, at the election of BPY. Brookfield Asset Management ("BAM") (NYSE: BAM; TSX: BAM.A; Euronext: BAMA) has agreed that, for a period of at least 20 years, it will guarantee the BPR shareholders' right to exchange a BPR share for a BPY unit or the cash equivalent of a BPY unit, as described above.

The Special Committee, comprised of non-executive, independent directors, has unanimously recommended that GGP shareholders approve the transaction. The Special Committee believes the transaction is fair to and in the best interests of GGP shareholders.

As a result of the transaction, GGP shareholders who receive equity consideration will be entitled to receive the same amount as BPY's current distribution on the BPY units or BPR shares they receive, which is over 40% higher than GGP's dividend (BPY annual distribution of $1.26 per unit vs. GGP dividend of $0.88 per share).

Brian Kingston, CEO of Brookfield Property Partners, said, "This is a compelling transaction that enables GGP shareholders to receive premium value for their shares and gives them the ability to participate in the long-term upside of their investment. We are pleased to have reached an agreement and are excited about combining Brookfield's access to large-scale capital and deep operating expertise across multiple real estate sectors with GGP's portfolio of irreplaceable retail assets."

He continued, "The introduction of the new BPR shares will allow GGP shareholders to efficiently participate in the transaction."

Daniel Hurwitz, Lead Director and Chairman of the Special Committee, said, "Since receiving Brookfield's initial proposal in November, the Special Committee has conducted extensive due diligence, specifically evaluating the optimal consideration structure for GGP's shareholders. After careful consideration, assisted by our independent advisors, the Special Committee determined that Brookfield's improved proposal, which includes an increase in the cash portion of the consideration and the ability to receive shares in a newly listed REIT entity, provides GGP shareholders with certainty of value, as well as upside potential through ownership in a globally diversified real estate company. We are pleased to have reached this agreement, which we believe is in the best interests of GGP and our shareholders."

With an ownership interest in approximately $90 billion in total assets and annual net operating income of more than $4 billion, the combined company will be one of the world's largest commercial real estate enterprises. Following completion of the transaction, GGP shareholders

will own approximately 26% of the combined company (calculated based on all BPR shares having been exchanged for BPY units and pro forma for the proposed BAM preferred share conversion as described below), which will possess one of the highest quality and most diverse portfolios of property globally, with a fortress balance sheet and strong overall financial profile.

Transaction Details

GGP shareholders will be entitled to elect to receive, for each GGP common share, either $23.50 in cash or either one BPY unit or one BPR share. Elections are subject to proration which will be based on aggregate consideration in the transaction of (1) a fixed amount of $9.25 billion in cash and (2) approximately 254 million BPY units / BPR shares, which represents aggregate consideration of approximately 61% cash and approximately 39% of BPY or BPR equity.

The consideration in the transaction will be structured as (1) a dividend by GGP paid in cash and equity (subject to proration) and (2) merger consideration paid in cash. As a result, all GGP shareholders will receive a portion of the consideration in cash (regardless of their election).

The cash portion of the consideration will be funded by a combination of approximately $4 billion from joint venture equity partners, and financings from a syndicate of lenders led by Deutsche Bank, Morgan Stanley, RBC Capital Markets and Wells Fargo Bank, National Association, with additional commitments from Bank of America Merrill Lynch, Barclays, HSBC, SMBC, and The Toronto-Dominion Bank.

In conjunction with and in support of the proposed transaction, BAM has stated its intention to convert $500 million currently held in BPY Class C Junior Preferred Shares into BPY units at a price of $23.50 per unit, resulting in BAM's acquisition of approximately 21.3 million BPY units.

In addition, to allow for synergies and cost savings between BPY and GGP to be effectuated following closing of the transaction, BAM,

which provides management services to BPY and will also provide services to BPR following closing, has agreed to waive, for one year, the management fees payable by BPR and the incremental management fees BPY would otherwise be required to pay in respect of the units issued in exchange for GGP shares.

The transaction is subject to the approval of (1) GGP shareholders representing at least two-thirds of the outstanding GGP common stock and (2) GGP shareholders representing a majority of the outstanding GGP common stock not owned by BPY and its affiliates. BPY and its affiliates have agreed to vote in favor of the transaction. The transaction is also subject to other customary closing conditions and is expected to close early in the third quarter of 2018.

GGP shareholders will receive a second quarter dividend of up to $0.22 per share (final amount to be prorated in the event the transaction closes prior to June 30).

Weil, Gotshal & Manges LLP, Goodwin Procter LLP and Torys LLP are serving as legal counsel to BPY and PwC is serving as tax advisor to BPY.

Goldman Sachs & Co. LLC is serving as financial advisor and Simpson Thacher & Bartlett LLP is serving as legal counsel to GGP's Special Committee. Citigroup Global Markets Inc. is serving as financial advisor and Sullivan & Cromwell LLP is serving as legal counsel to GGP.

All dollar references are in U.S. dollars, unless noted otherwise.

### *The Inadequate Merger Consideration*

61.    The Company's strong financial performance and potential for continued growth, together with its synergistic value to Brookfield, establish the inadequacy of the merger consideration.  Furthermore, as stated above the Proposed

Transaction has been the target of ire for many in the financial media, who have publicly discussed the Proposed Transaction as undervalued.

62.     Pursuant to the terms of the Agreement, the Transaction values shares of GGP at $23.50 per share.  Significantly, shares of GGP traded higher than the value contained in the Proposed Transaction as recently as January 22, 2018.

63.     Moreover, the Company has traded as high as $24.37 per share within the past year, a valuation nearly 4% greater than what is offered in the Proposed Transaction, further indicating the lack of premium available to GGP stockholders.

64.     In addition, and as stated previously, several financial firms and analysts have recently placed GGP's valuation well over the valuation offered in the Proposed Transaction.  In fact, on March 27, 2018, analysts at Boenning Scattergood revised their rating up, *one day after the Merger Announcement*, to a value of $35.00 per share, and reiterated their "Buy" rating.  Notably, this valuation represents a value ***approximately 49% higher than that contained in the Proposed Transaction***.

65.     Others have been more pointed in their criticisms of the deal, with Adam Levine-Weinberg at *The Motley Fool* penning an April 11, 2018 article that described the deal as "GGP agree[ing] to be acquired by Brookfield for substantially less than its NAV."

66.     Furthermore, in a note to investors shortly after the announcement of the merger, BTIG LLC analysts James Sullivan and Ami Probandt, estimated the

value of the new offer at $21.90 a share, below estimates of $28.06 to $32.93 a share for the net asset value of GGP's holdings, and described the price as being "wholly inadequate."

67. In more specific detail, Sullivan and Probandt stated, "GGP management has clearly stated on numerous occasions to shareholders that its assets are worth substantially more than where its shares are currently trading," They went on further to, "…recommend that GGP's independent shareholders reject the new offer."

68. BTIG LLC is not alone in recommending that GGP stockholders vote against the Proposed Transaction, with Floris van Dijkum at Boenning & Scattergood stating, "We believe investors should vote against the transaction as it does not offer sufficient value. We note that Brookfield has essentially silenced sell-side analysts as most banks are involved in the transaction in one way or another. GGP does not need to do any transaction as it has balance sheet strength and earnings growth to ride out the cyclical slowdown."

69. Alexander Goldfarb, an analyst with Sandler O'Neill & Partners, LP was quoted in Bloomberg on March 28, 2018, as stating that, "If you're an investor, you're obviously frustrated," he continued, speaking ill of the consideration in the Proposed Transaction, "This is not a true reflection of what the company is worth."

70.     As discussed herein, GGP's stock is undervalued, and is likely to rise as Class A properties weather the perceived retail downturn much more readily than less expensive retail properties.

71.     Finally, the Proposed Transaction has enormous synergistic value to Brookfield that is not captured by the Merger consideration.   The merger announcement makes it clear that the Proposed Transaction "allow for synergies and cost savings between BPY and GGP to be effectuated following closing of the transaction."

72.     Notably, the consideration offered in the Proposed Transaction is even less desirable than its insufficient monetary amount would have one believe.  GGP stockholders may choose a cash option of $23.50, which would result in their complete exclusion from the returns on such strong synergies.  If they wish to accept equity instead, GGP stockholders must choose between units of Brookfield itself, an externally managed non-U.S. partnership subject to different restrictions than U.S. corporations, or stock in a newly created, untested U.S. REIT ("BPR") that is "expected" to be listed on the NASDAQ.  This expectation is of little comfort to GGP stockholders who must either choose to be cashed out for a completely inadequate price, invest in an outside controlled foreign partnership, or roll the dice with stock on a Company that has yet to be registered on a U.S. stock exchange.  In short, Plaintiff and GGP stockholders are being offered a "lose-lose-lose" scenario.

73.     Moreover, the Brookfield unit consideration option becomes even more insufficient when considering that it is subject to the fluctuations of the market, and not protected in any fashion.  Specifically, the Merger Agreement does not include protections to ensure that the stock consideration payable to stockholders who elect such an option will remain within a range of reasonableness.  In a conventional transaction which contemplates stock of the acquiring company as a whole or part of the consideration offered in the Proposed Transaction, the parties often negotiate and implement a "floor" on the value of the consideration payable to shareholders, which establishes the lowest possible price payable.  Such transactions also often include a "collar," which establishes parameters that attempt to minimize the impact of stock price fluctuations on the value of the consideration payable to shareholders.  The Merger Agreement contains none of these protections.  Rather, the Merger Agreement contains a *fixed* exchange ratio of 1:1 which means that GGP stockholders will receive 1 unit of Brookfield common units for each of their shares, *regardless of Brookfield's stock price at the close of the transaction*.  Thus, the consideration payable to GGP stockholders is not insulated from fluctuations in Brookfield's stock price, and stockholders are left in the precarious position of not knowing whether the consideration payable to them will decline further.

74.     As stated above, the problems with Brookfield equity being presented as part of the consideration is problematic in and of itself, due to the fact that

Brookfield is an externally managed non-U.S. partnership subject to different restrictions than U.S. corporations.   These problems were well known to the Company and Board; in fact, a February 9, 2018 statement by financial analyst firm Boenning and Scattergood, states, in part, as follows (empha

> Most dedicated investors have told us they either can't or don't want to own [Brookfield] stock…At an estimated 4.75% cap rate for Westfield's US portfolio, based on our estimates, this transaction suggests that the latest [Brookfield's] [IFRS] valuation of [GGP] is smoke and mirrors, in order to ensure success for another underwhelming offer…We could hope that [GGP]'s independent board sees through the smoke and evaluates the merits of the proposed bid in the cold, hard light it deserves.  'A' malls are currently undervalued in the public markets, but sentiment can change as it has in the past.

75.     Clearly, the Special Committee, Board, Company, and Brookfield were all extremely aware of GGP's public stockholders' aversion to an exchange of their GGP stock for Brookfield units, or to take a cashing out at such an inadequate price – however, the Defendants simply did not care.

76.     Accordingly, the Proposed Transaction will allow Brookfield to purchase GGP at an unfairly low price while availing itself of GGP's significant value and upside or long-term potential.

***Potential Conflicts of Interest***

77.     As stated above, Brookfield has long-held a significant interest in GGP, and recently increased that interest to approximately 34% in aggregate shortly before the sales process leading to the Proposed Transaction began.

78.    As a consequence of Brookfield's substantial holdings in GGP, at least three GGP Board members, including Defendant's Clark, Kingston, and Flatt (the latter of whom serves as Chairman of the GGP Board), are current, high-level employees of Brookfield and/or Brookfield affiliates, and as such, are controlled by Brookfield.

79.    In addition, Defendant Fukakusa, while being described as "independent" by the Company Board, is beholden to RBC, where she has worked in high level positions for over thirty years, and who holds a financial interest in the successful outcome of the Proposed Transaction.  While at first glance it seems incredulous that such an individual would be deemed "independent" enough to garner a seat on the Special Committee, at closer look, and considering Defendant Clark's position on the Nominating and Governance committee of the GGP Board, it becomes clear that Fukakusa's presence on the Special Committee was clearly orchestrated by Brookfield.

80.    Furthermore, it is clear the financial media considers that Brookfield is attempting to acquire the Company for a completely inadequate low-ball bid by utilizing its control over GGP.

81.    Notably, Levine-Weinberg stated as such in his April 11, 2018, *Motley Fool* article, which states in relevant part:

**GGP's board gives in easily**

Brookfield Property Partners currently owns a 34% stake in GGP. It has been looking to buy the rest of the company for a while. In late 2017, Brookfield offered a cash and stock deal valued at $23 per share to acquire the other 66% of GGP. However, a special committee of the latter's board of directors rejected the offer, declaring that it was inadequate.

Brookfield didn't have to sweeten the offer very much to get the support of GGP's board. Last month, it submitted a revised offer that valued GGP at $23.50 per share and included a larger cash component (roughly 61%, compared to 50% in the original offer).

This new offer was still well below GGP's NAV, which REIT analysts have estimated at about $30/share. Brookfield countered that current GGP shareholders will benefit from having the option of an immediate cash payment, plus a higher dividend and upside potential if they convert their GGP shares to Brookfield Property units, or shares of an equivalent REIT that will be created. In any case, the special committee voted to accept this offer.

GGP investors now must decide whether or not to vote for Brookfield Property Partners' offer. Unfortunately for them, Brookfield's existing 34% stake in GGP deterred other potential bidders from submitting rival offers.

82.     Sandler O'Neill financial analyst Adam Goldfarb stated: "This is not a true reflection of what the company is worth. But without a competing bid, it's tough to advocate against the deal." However, it is clear that the reasons that there was no competing bid, was due to the actions of Brookfield and its controlled Directors on the Board.

83.     In addition to Brookfield's controlling interest in the Proposed Transaction, they have roped in "most banks [which] are involved in the transaction

33

in one way or another" as stated by Boenning & Scattergood analyst van Dijkum. This includes RBC, which controls Defendant Fukakusa, a so-called "independent" Board member who sat on the Special Committee throughout the sales process and who had a direct hand in the decision-making process that completely averred any attempt to solicit third party bids for GGP whatsoever.

84.     Moreover, the substantial interests of the Individual Defendants and other Company insiders themselves cannot be ignored.  Notably, Company insiders, including the Individual Defendants, currently own large, illiquid portions of Company stock that will be exchanged for significant stakes in the combined corporation upon the consummation of the Proposed Transaction as follows:

| Name of Beneficial Owner | GGP Common Stock | | Series A Preferred Stock | |
|---|---|---|---|---|
| | Number of Shares Beneficially Owned | Percent of Class | Number of Shares Beneficially Owned | Percent of Class |
| **Named Executive Officers** | | | | |
| Sandeep Mathrani | 6,329,166 (1)(2)(3) | * | — | — |
| Michael B. Berman | 828,807 (1)(2)(3) | * | — | — |
| Heath Fear | 147,412 (3) | * | — | — |
| Shobi Khan | 1,948,367 (1)(2)(3) | * | — | — |
| Richard S. Pesin | 1,520,520 (1)(2)(3) | * | — | — |
| **Directors** | | | | |
| Richard B. Clark(4) | 327,053,880 (5) | 34.2% | — | — |
| Mary Lou Fiala | 44,028 | * | — | — |
| J. Bruce Flatt(4) | 327,053,880 (5) | 34.2% | — | — |
| Janice R. Fukakusa | 3,311 (3) | * | — | — |
| John K. Haley | 47,242 (2) | * | — | — |
| Daniel B. Hurwitz | 35,592 | * | — | — |
| Brian W. Kingston(4) | 327,053,880 (5) | 34.2% | — | — |
| Christina M. Lofgren | 3,311 (3) | * | — | — |
| All directors and executive officers as a group (16 persons) | 338,366,700 (1)(2)(3)(5) | 35.0% | — | * |

85.     In addition, pursuant to the Merger Agreement, as a consequence of the merger, each outstanding and unvested Company option and/or restricted stock will

automatically vest and/or be converted into the right to receive cash or stock in certain amounts.  As a result, the Individual Defendants will receive immediate lump sum cash payments in exchange for their (collective) thousands of currently illiquid GGP options and restricted stock.

86.     Furthermore, certain GGP Directors and Officers hold lucrative "golden parachute" agreements with the Company as a part of their employment agreements.  Such agreements ensure that should any such Director or Officer's employment be terminated by a qualifying "change-in-control" (such as that contemplated by the Proposed Transaction) they would receive significant compensation.  Specifically, according to the Company's most recent annual proxy statement, the following chart shows that several such Company insiders stand to gain millions of dollars from the Proposed Transaction.

**Golden Parachute Compensation**

| Name | Cash[1] | Equity[2] | Perquisites/ Benefits[3] | Tax Reimbursement[4] | Other[5] | Total |
|------|--------|-----------|--------------------------|----------------------|----------|-------|
| Sandeep Mathrani | $ 7,086,329 | $ 42,087,502 | $ 29,047 | $ — | $ 1,110 | $ 49,203,988 |
| Shobi Khan | 1,198,356 | 8,157,413 | — | — | — | 9,355,769 |
| Heath Fear | 948,904 | 1,121,120 | — | — | — | 2,070,024 |
| Richard Pesin | 623,630 | 4,845,616 | — | — | — | 5,469,246 |
| Michael Berman | — | — | — | — | — | — |

87.     Notably, Defendant Mathrani will receive over *$49 million* as a result of the consummation of the Proposed Transaction, a figure not shared amongst the Plaintiff and other public stockholders of GGP.

88.     Clearly, based on the above, the Proposed Transaction is the product of an unfair and inadequate sales process conducted by the Board and Company insiders with an eye to personal compensation and in breach of its fiduciary duties and which fails to maximizer stockholder value.

***Preclusive Deal Mechanisms***

89.     The Agreement contains certain provisions that unfairly favor Brookfield by making an alternative transaction either prohibitively expensive or otherwise impossible.  For example, the Agreement contains a termination fee provision that requires GGP to pay up to $400,000,000.00 to Brookfield if the Merger Agreement is terminated under certain circumstances.  Under one such circumstance, GGP must pay the termination fee to Brookfield should it enter into any acquisition proposal up to ***twelve (12) months*** after the Proposed Transaction is terminated.

90.     The termination fee payable under this provision will make the Company that much more expensive to acquire for potential purchasers, while resulting in a corresponding decline in the amount of consideration payable to GGP stockholders.

91.     Additionally, the Merger Agreement also contains a "No Solicitation" provision that restricts GGP from considering alternative acquisition proposals by,

*inter alia*, constraining GGP's ability to solicit or communicate with potential acquirers.

92.     Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, Defendants agreed to provide the GGP information in order to match any other offer and ensuring that they have 48 hours to make such an offer, thus providing the Brookfield access to the unsolicited bidder's financial information and giving the Brookfield the ability to top the superior offer.  Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of the Brookfield.

93.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction, and the Proposed Transaction is the product of the Board's breaches of fiduciary duty, aided and abetted by Brookfield and Merger Sub.

**The Materially Misleading and/or Incomplete S-4**

94.     On May 2, 2018, GGP filed with the SEC a materially misleading and incomplete S-4 that failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction, thus exacerbating and

continuing the Board's breaches of fiduciary duty aided and abetted by Brookfield and Merger Sub.

*Omissions and/or Material Misrepresentations Concerning the Sales Process Leading Up to the Proposed Transaction*

95.   Specifically, the S-4 fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the S-4 fails to disclose the following:

a.   The S-4 fails to disclose why Defendant Fukakusa was designated as "independent" or allowed to be a member of the Special Committee given her relationship with RBC, an entity with financial interests in the outcome of the Proposed Transaction;

b.   The S-4 fails to disclose any reasoning whatsoever for the failure to perform a market check for potentially interested third parties at any point during the sales process;

c.   The S-4 fails to disclose the nature and identity of the "independent compensation consultant" or the specific nature of the conversations between the Special Committee and the independent compensation consultant on January 5, 2018 "relating to management compensation in connection with a potential transaction involving GGP.";

d. The S-4 fails to disclose the reason Citigroup was retained, why it did not provide a fairness opinion when it was engaged as a financial advisor to GGP and how much it was paid for whatever services it provided;

e. The S-4 fails to disclose the amount paid by the Company to the independent compensation consultant; and

f. The S-4 fails to disclose the specific nature of the non-disclosure agreement executed between GGP and Brookfield on December 6, 2017, and if the terms of such agreement included a "don't-ask, don't-waive" provision or standstill provision, and if so, the specific conditions, if any, under which such provisions would fall away or prevent other parties from submitting a bid.

*Omissions and/or Material Misrepresentations Concerning GGP's Financial Projections*

96.     The S-4 fails to provide material information concerning financial projections provided by GGP's management and relied upon by the financial analyst for the Special Committee Goldman Sachs & Co. LLC ("Goldman Sachs") in its analyses.   The S-4 discloses management-prepared financial projections for the Company which are materially misleading.   The S-4 indicates that in connection with the rendering of Goldman Sachs' fairness opinion, Goldman Sachs reviewed

"certain internal financial analyses and forecasts for GGP prepared by GGP management as approved for Goldman Sachs' use by the special committee, which we refer to as the GGP forecast." Accordingly, the S-4 should have, but fails to provide, certain information in the projections that GGP's management provided to the Board and Goldman Sachs. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

97. The S-4 fails to provide material information concerning the financial projections prepared by GGP management. Specifically, the S-4 fails to disclose the material line items for the following metrics:

    a. The line items used to calculate Company Same Store Net Operating Income ("NOI"), including:

        i. Percent growth;

        ii. Lease termination income;

        iii. Land sales revenues; and

        iv. Other NOI.

    b. The line items used to calculate Company NOI, including:

       i.     Percent Growth;

c.  The line items used to calculate Adjusted Real Estate NOI, including:

       i.     Percent Growth;

d.  The line items used to calculate EBITDA, including:

       i.     Percent Growth;

e.  The line items used to calculate FFO/Share, including:

       i.     Percent Growth;

f.  The line items used to calculate AFFO/Share, including:

       i.     Percent Growth.

g.  The line items used to calculate Dividend/Share, including

       i.     AFFO payout ratio

h.  The line items used to calculate FFO, including

       i.     Tenant allowance;

      ii.     Ordinary capital;

i.  The line items used to calculate AFFO, including

       i.     Capitalization costs/non-cash FFO;

      ii.     Debt amortization;

     iii.     Regular Dividends

j.  The line items used to calculate Levered Free Cash Flow, including,

     i.    Development expenditures;

    ii.    Ala Moana condos;

   iii.    Asset acquisitions;

   iv.    Notes receivable activity;

    v.    Asset sales;

   vi.    Special dividend;

  vii.    Stock repurchase;

 viii.    Financings;

   ix.    Warrant cash settlement;

    x.    Net preferred stock issuance/repayment;

   xi.    Construction financing;

  xii.    Issuance/(repayment) of revolver;

98.    This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

99.    Without accurate projection data presented in the S-4, Plaintiff and other stockholders of GGP are unable to properly evaluate the Company's true

worth, the accuracy of Goldman Sachs' financial analyses, or make an informed

decision whether to vote their Company stock in favor of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning Brookfield's*

*Financial Projections*

100.   The S-4 fails to provide material information concerning financial

projections provided by Brookfield's management and relied upon by Goldman

Sachs in its analyses.  The S-4 discloses management-prepared financial projections

for the Company which are materially misleading.   The S-4 indicates that in

connection with the rendering of Goldman Sachs' fairness opinion, Goldman Sachs

reviewed

> "certain internal financial analyses and forecasts for BPY on a
> stand-alone basis and for BPY on a pro forma basis giving effect
> to the proposed Transactions, in each case prepared by BPY
> management and as approved for Goldman Sachs' use by the
> special committee, which we refer to as the BPY forecasts,
> including certain operating synergies projected by BPY
> management to result from the proposed Transactions as
> approved for Goldman Sachs' use by the special committee,
> which we refer to as the synergies."

Accordingly, the S-4 should have, but fails to provide, certain information in the

projections that GGP's management provided to the Board and Goldman Sachs.

Courts have uniformly stated that "projections … are probably among the most

highly-prized disclosures by investors.   Investors can come up with their own

estimates of discount rates or [] market multiples.   What they cannot hope to do is

replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

101.    The S-4 fails to provide material information concerning the financial projections prepared by BPY management.  Specifically, the S-4 fails to disclose the material line items for the following metrics regarding the Brookfield Standalone forecasts:

a.  The line items used to calculate net operating income ("NOI"), including:

    i.  Core office revenue;

    ii.  Core retail revenue;

    iii.  Opportunistic revenue;

    iv.  Percent growth.

b.  The metric of Total MSA Payments, including its line item, G&A expenses;

c.  The line items used to calculate EBITDA, including:

    i.  Interest Expense (Converted Capital Securities);

    ii.  Interest Expense (Capital Security Redeemed for Stock).

d.  The line items used to calculate Company FFO/Unit, including,

    i.  Percent growth.

e.  The line items used to calculate Distribution/Unit, including

      i.    Percent growth;

      ii.    FFO payout ratio;

      iii.    Company FFO;

      iv.    Other Operating Cash FLow

f.  The line items used to calculate Levered Free Cash flow, including:

      i.    Interest expense;

      ii.    Net other income;

      iii.    Maintenance capital expenditures;

      iv.    Development capital expenditures;

      v.    Mandatory debt amortization;

      vi.    Other cash flow items.

g.  The line items used to calculate Levered Free Cash Flows, including

      i.    Cash flow from operations;

      ii.    Cash flow from investing activities, including its line items,

          1.  Cash flow Financing – debt;

          2.  Cash flow financing – capital securities/pref;

          3.  Cash flow Financing – Equity;

          4.  Contribution from NCI.

      iii.    Cash flow from financing activities, including its line items,

          1.  Distributions to investors;

iv.   Net cash flow after distributions

102.   The S-4 fails to provide material information concerning the financial projections prepared by BPY management.  Specifically, the S-4 fails to disclose the material line items for the following metrics regarding the Brookfield combined forecasts:

a.  The line items used to calculate net operating income ("NOI"), including:

   i.   Core office revenue;

   ii.   Core retail revenue;

   iii.   Opportunistic revenue;

   iv.   Percent growth;

   v.   Brookfield standalone MSA payment;

   vi.   Incremental MSA Payment

b.  The metric of Total MSA Payments, including its line items,

   i.   Brookfield (ex. GGP) G&A expense;

   ii.   GGP G&A expense;

   iii.   G&A synergies

c.  The metric of Pro Forma G&A Expense

d.  The metric of Total MSA & G&A Expense

e.  The line items used to calculate Company FFO/Unit, including,

      i.    Percent growth.

    f.  The metric of Brookfield standalone – Company FFO/Share, including

      i.    Percent FFO Acceleration/(Dilution)

    g.  The metric of Dividend/Share, including its metrics,

      i.    Percent growth;

      ii.   FFO payout ratio;

      iii.  Total debt;

      iv.  Capital securities;

      v.   Perpetual Preferred Securities

103.   This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

104.   Moreover, Brookfield should have provided financial forecasts for BPR, given that one option of the Merger consideration is stock in BPR.

105.   Without accurate projection data presented in the S-4, Plaintiff and other stockholders of GGP are unable to properly evaluate the Company's true

worth, the accuracy of Goldman Sach's financial analyses, or make an informed decision whether to vote their Company stock in favor of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses Made by Goldman Sachs*

106. In the S-4, Goldman Sachs describes its respective fairness opinion and the various valuation analyses performed to render such opinion. However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

107. With respect to the *Illustrative Comparable Companies Analysis*, the S-4 fails to disclose:

    a. The objective selection criteria and inputs and assumptions for each of the selected companies;

    b. Why only three companies were chosen for comparison;

    c. The objective selection criteria for the dates used in the Cap Rates analysis;

    d. The specific benchmarking values for each compared company and GGP, including

        i.   Implied cap rates over time

ii.   P/NTM FFO multiples over time

108.   With respect to the *Illustrative Present Value of Future Share Price Analysis for GGP (Based on Implied Forward Capitalization Rates)*, the S-4 fails to disclose:

a.  The specific inputs and assumptions used to calculate capitalization rates for GGP of 6.75% to 5.75%; and

b.  The specific inputs and assumptions used to calculate the illustrative discount rate of 8.1%.

109.   With respect to the *Illustrative Present Value of Future Share Price Analysis for GGP (Based on Forward FFO Multiples)*, the S-4 fails to disclose:

a.  The specific inputs and assumptions used to calculate forward FFO multiples of 10.0x to 15.0x; and

b.  The specific inputs and assumptions used to calculate the illustrative discount rate of 8.1%.

110.   With respect to the *Illustrative Levered Discounted Cash Flow Analyses of GGP*, the S-4 fails to disclose:

a.  The specific inputs and assumptions used to calculate an illustrative discount rate range of 7.5% to 8.5%; and

b.  The specific inputs and assumptions used to calculate the terminal growth rates range of 1.5% to 2.5%

49

      c.  The specific inputs and assumptions used to calculate levered free cash flows.

111.  With respect to the *Selected Precedent Transactions Analysis*, the S-4 fails to disclose:

      a.  The objective selection criteria and inputs and assumptions for each of the selected transactions;

      b.  The type of consideration received by the target company stockholders in each of the selected transactions; and

      c.  The specific transaction value for the transactions analyzed

112.  With respect to the *Illustrative Present Value of Future Unit Price Analysis for BPY*, the S-4 fails to disclose:

      a.  The specific inputs and assumptions used to calculate forward FFO multiples of 12.0x to 16.5x; and

      b.  The specific inputs and assumptions used to calculate the illustrative discount rate of 9.0% s.

113.  With respect to the *Illustrative Levered Discounted Cash Flow Analyses of BPY*, the S-4 fails to disclose:

      a.  The specific inputs and assumptions used to calculate an illustrative discount rate range of 8.0% to 10.0%; and

     b.  The specific inputs and assumptions used to calculate the terminal growth rates range of 1.5% to 2.5%.

114.  With respect to the *Illustrative Levered Discounted Cash Flow Analyses of BPY on a Pro Forma Basis*, the S-4 fails to disclose:

     a.  The specific inputs and assumptions used to calculate an FFO Multiples of 12.0x to 16.0x;

     b.  The specific inputs and assumptions used to calculate an illustrative discount rate of 9.0%;

     c.  The specific metrics used to calculate Levered free cash flow.

115.  Without the omitted information identified above, GGP's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests. Moreover, without the key financial information and related disclosures, GGP's public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in their best interests

**FIRST COUNT**

**Breach of Fiduciary Duty**
**Against the Individual Defendants**

116.  Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

117.   As alleged herein, Defendants have initiated a process to sell GGP in a transaction that undervalues the Company.  The Individual Defendants are privy to non-public information concerning the Company that the public stock stockholders are not; thus, there exists a fiduciary duty to protect these stockholders.  Defendants have failed to sufficiently inform themselves of GGP's value, or have disregarded the true value of the Company.  Furthermore, the Individual Defendants have agreed to onerous deal protection devices that discourage any alternate acquirer from coming forward in the face of the knowledge that Brookfield can block the purchase.

118.   As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to Plaintiff and the other members of the Class, and will further a process that inhibits the maximization of stockholder value and the disclosure of material information.

119.   Plaintiff and the members of the Class have no adequate remedy at law.

## SECOND COUNT

### Aiding and Abetting the Board's Breaches of Fiduciary Duty
### Against Brookfield and Merger Sub

120.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

121.   Brookfield and Merger Sub knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Transaction, which, without such aid, would not have occurred.  In connection with discussions

52

regarding the Proposed Transaction, Brookfield and Merger Sub secured certain deal

protection provisions which unfairly inhibit the advancement of alternative

proposals.  In addition, Brookfield and Merger Sub obtained sensitive non-public

information concerning GGP's operations and thus had the advantage to acquire the

Company at a price that is unfair to Plaintiff and the Class.

122.   As a result of this conduct, Plaintiff and the other members of the Class

have been and will be damaged in that they have been and will be prevented from

obtaining a fair price for their shares.

123.   Plaintiff and the members of the Class have no adequate remedy at law.

## THIRD COUNT

### Violations of Section 14(a) of the Exchange Act
### Against All Defendants

124.   Plaintiff repeats all previous allegations as if set forth in full herein.

125.   Defendants have disseminated the S-4 with the intention of soliciting

stockholders to vote their shares in favor of the Proposed Transaction.

126.   Section 14(a) of the Exchange Act requires full and fair disclosure in

connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by
> any means or instrumentality of interstate commerce or of any
> facility of a national securities exchange or otherwise, in
> contravention of such rules and regulations as the [SEC] may
> prescribe as necessary or appropriate in the public interest or for
> the protection of investors, to solicit or to permit the use of his
> name to solicit any proxy or consent or authorization in respect

of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

127.   As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

128.   The S-4 was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that the S-4 is materially misleading and omits material facts that are necessary to render them non-misleading.

129.   The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

130.   The Individual Defendants were at least negligent in filing an S-4 that was materially misleading and/or omitted material facts necessary to make the S-4 not misleading.

131.   The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of its entitlement

to decide whether to vote its shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

## FOURTH COUNT

### Violations of Section 20(a) of the Exchange Act
### Against The Individual Defendants

132.    Plaintiff repeats all previous allegations as if set forth in full herein.

133.    The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.    Because of their possession of such information, the Individual Defendants knew or should have known that the S-4 was materially misleading to Company stockholders.

134.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the S-4 and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were

able to, and did, control the contents of the S-4.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the S-4 before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

135.   The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of GGP's business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the S-4 was misleading.  As a result, the Individual Defendants are responsible for the accuracy of the S-4 and are therefore responsible and liable for the misrepresentations contained herein.

136.   The Individual Defendants acted as controlling persons of GGP within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause GGP to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled GGP and all of its employees.  As alleged above, GGP is a primary violator of Section 14 of the Exchange Act and SEC Rule S-4.  By reason of their

conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

A.     Declaring that this action is properly maintainable as a class action, certifying Plaintiff as Class representative and certifying his counsel as Class counsel;

B.     Preliminarily and permanently enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction on the terms presently contemplated;

C.     To the extent the Proposed Transaction is consummated before entry of this Court's judgment, rescinding it and setting it aside or awarding rescissory damages;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

Dated:  May 3, 2018                          **COOCH & TAYLOR**

                              By:   */s/ Blake A. Bennett*
                              Blake A. Bennett (#5133)

57

The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE 19801
Tel:   (302) 984-3800
Fax:   (302) 984-3939
bbennett@coochtaylor.com

**OF COUNSEL**

Evan J. Smith, Esquire
Marc L. Ackerman, Esquire
**BRODSKY & SMITH, LLC**
Two Bala Plaza, Suite 510
Bala Cynwyd, PA 19004
Phone: (610) 667-6200
Facsimile: (610) 667-9029
esmith@brodskysmith.com
mackerman@brodskysmith.com

*Attorneys for Plaintiff*